# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 11, 2012

## STATE OF TENNESSEE v. ROBERT AARON WHITE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40901441     Michael R. Jones, Judge**

---

**No. M2011-01985-CCA-R3-CD     Filed June 4th, 2013**

---

Defendant, Robert Aaron White, was indicted by the Montgomery County Grand Jury for one count of first degree premeditated murder, two counts of aggravated assault, and one count of possession of a firearm by a convicted felon. Both counts of aggravated assault and the firearm offense were dismissed prior to trial. Defendant was convicted by a petit jury of the lesser-included offense of second degree murder and sentenced by the trial court to serve 23 years in the Tennessee Department of Correction. Defendant appeals his conviction and asserts that the evidence is insufficient to support his conviction and that the trial court erred by refusing to allow Defendant to cover his facial tattoos during trial. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Jeremy W. Parham, Manchester, Tennessee, (on appeal); and James Phillips and Wayne Clemons, Clarksville, Tennessee, (at trial), for the appellant, Robert Aaron White.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Nash and J. Lee Willoughby, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Facts*

On October 6, 2009, William Rostorfer went to the home of the victim, Jimmy Yeager, with Mr. Rostorfer's mother-in-law, Luella Tower, to pick up Mr. Yeager and take him back to Ms. Tower's house. When they arrived, Mr. Yeager "was upset." Mr. Rostorfer

testified that Mr. Yeager was on the phone "with some guy, and they were arguing and fighting." As they were getting ready to leave, they saw a red car "coming down the hill." The car drove slowly past the driveway and turned around and came back. Mr. Rostorfer and Mr. Yeager handed their keys and wallet to Ms. Tower and walked down the driveway toward the road. Mr. Rostorfer testified that he "was just worried [Mr. Yeager] might get jumped[.]" He testified that the red car stopped in front of the driveway, and he heard "'I've got something for you and pop." He heard "a couple of pops [gunshots]," and he ducked and ran. He could not see how many people were inside the car. He saw a "flash coming out of the car." He testified that the victim "was squirting blood out of his back," and thus Mr. Rostorfer knew the victim had been shot. The victim told Mr. Rostorfer that Defendant "was the one that did it." Mr. Rostorfer did not know Defendant before the incident. He testified that since the incident, Defendant told him, "'if nobody testified[,] then [Rostorfer's] family would quit getting threatened.'" Defendant told him that while the two men were incarcerated together. He testified that he and the victim were about ten feet away from the car when the shots were fired and that no one ever got out of the car.

Luella Tower testified that Mr. Yeager had called her on the night of the incident and asked her to pick him up and take him to her house. When she got there he told her that someone was coming to his house to fight him. She testified that they were standing in the driveway talking. Mr. Yeager said that he was going inside to get a shirt when they saw a car drive down the street and turn around. Mr. Yeager said, "'that's him'" and told Ms. Tower to get in her car. She got in her car and watched Mr. Yeager and Mr. Rostorfer walk down the driveway towards the car. They said they didn't "want no trouble [sic]." She then heard someone inside the car say "'I got something for you," and she heard gunshots. She could not identify anyone inside the vehicle. Mr. Gay lay Mr. Yeager in the grass. Mr. Yeager told Ms. Tower that he was dying and that Defendant had shot him.

Scott Gay went to Mr. Yeager's house with Ms. Tower. He testified that when they arrived, Mr. Yeager "was saying something about fighting somebody, with Robert or with Rob." Mr. Gay was standing in Mr. Yeager's driveway when he saw a red car drive past and turn around and stop at the end of the driveway. Mr. Yeager said, "here he is," and Mr. Yeager and Mr. Rostorfer walked towards the car. Mr. Yeager saw the driver of the vehicle and identified Defendant at trial as the driver. Mr. Gay heard Mr. Yeager say, "holy shit" and run back up the driveway. Mr. Gay then heard gunshots and saw Mr. Yeager get hit. Mr. Gay testified that "about three weeks [earlier, Defendant] jumped [him] from behind." He testified that he went to Mr. Yeager's house on that prior occasion "because he ha[d] some beers over there," and that Defendant was also there. Mr. Gay testified that it was a "one-sided beating."

Assistant medical examiner John Davis performed the victim's autopsy. The victim died from a gunshot wound to the torso, and the manner of death was homicide. The bullet entered the victim's back and exited his chest. There was no soot or stippling around the wound, indicating that the victim was shot from "at least two feet away." The victim had multiple tattoos on his arms, torso, head and neck. A toxicology report indicated that the victim had ethanol in his blood, which Dr. Davis testified "equates to about a [.13] blood alcohol [content]." On cross-examination, Dr. Davis testified that the "entrance wound would look different" had it hit something else, like the ground, before hitting the victim. He testified that "once [the bullet] stops its spin . . . it leaves a different mark."

Investigators recovered two shell casings in the road. The victim and Mr. Gay and Mr. Rostorfer were unarmed. Investigators also found a Taurus nine millimeter handgun and a 9 millimeter spent shell casing in Defendant's vehicle. There was a magazine with two rounds in it.

Tennessee Bureau of Investigation (TBI) Agent James Davis analyzed Defendant's clothing and found "the presence of particles that were unique to gunshot primer residue[,]" indicating that the clothing was near a gun at the time it was fired or came in contact with a recently fired weapon.

TBI Agent Teri Arney testified that the two shell casings found at the crime scene and the shell casing found in Defendant's vehicle were all fired from the handgun found in Defendant's vehicle. Agent Arney observed during his test firing of the handgun that the shell casings ejected to the right "at 3:00" and traveled two to five feet. He testified that if the firearm was fired from a "sideways" position, it would change the trajectory of the shell casings, but he fired it from an upright position. Agent Arney fired the weapon five times. Agent Arney also testified that in his experience firing nine millimeter handguns, he aimed at the target by extending his arm in front of him and visually lining up the sites with the target.

Margarita Yeager, the victim's mother, testified that she met Defendant in November, 2008, while visiting her granddaughter, who was the daughter of Defendant's girlfriend. Ms. Yeager testified that she went to Defendant's girlfriend's apartment to pick up her granddaughter for visitation, and Defendant was always there because "he didn't work." She testified that beginning in 2009, Defendant took Ms. Yeager's granddaughter to Ms. Yeager's house because "he want[ed] to give her to me because she was in the way I guess." Ms. Yeager testified that Defendant had expressed his desire for her to have custody of her granddaughter. Defendant told her that "he [was] going to make the mom sign her to [Ms. Yeager[.]"

Defendant testified that he was 29 years old at the time of trial. He moved with his then wife from California to Tennessee in 2004. In October 2009, he was living in Clarksville with his girlfriend, Valerie Estep, and Ms. Estep's child Kaylee. The victim's brother Darren was the father of Ms. Estep's child, and Defendant took the child to see the victim and his mother because "Valerie d[id]n't want nothing [sic] to do with the Yeagers, whether it's Margarita [the child's grandmother] or Kaylee's father." Defendant testified, "I like Margarita. I feel bad for what happened. I liked Jimmy." Defendant testified that before they "started falling out towards the end of [their] relationship [they] were always together." Defendant eventually "cut[ ] ties with [the victim]" because of incidents between Ms. Yeager and Ms. Estep involving the victim's niece. Defendant testified that for two weeks prior to the shooting, he refused to answer Mr. Yeager's phone calls.

Defendant testified that he gave Mr. Yeager tattoos. He testified that Mr. Yeager wanted a tattoo on his face, and Defendant "wrote Kaylee [and] stamped it on his face." He also "put a cross on his cheek . . . , and [he] put a teardrop on his eye . . . , on his left side." Defendant also "put So Cal for southern California" on Mr. Yeager's neck. Defendant testified that Mr. Yeager wanted a teardrop tattoo "[b]ecause [Yeager] told [Defendant] he [had] killed someone before."

Defendant testified that on October 6, 2009, Mr. Yeager "wanted to fight" him. He testified that Mr. Yeager "wouldn't stop calling," and Defendant tried to ignore Mr. Yeager's calls. Defendant testified that he "didn't want no [sic] problem" and that he "was already scared of [Mr. Yeager]." Defendant drove to Mr. Yeager's house and took "some beers" with him. As he approached the house, he saw Mr. Yeager and "that big ole white boy," and Defendant drove past the house and turned around because the road ended at a dead end. As he drove back towards the house, he saw Mr. Yeager and Mr. Rostorfer throwing their shirts down and "com[ing] down the driveway." He saw Mr. Rostorfer "reaching behind his back." Rostorfer and Yeager were "about seven to ten feet" away from Defendant's car, and Defendant "grab[bed] [his] pistol [and he] bust twice." He testified that the two men were larger than him and they were "bum-rushing him" and he was afraid they were "going to beat the shit out of [him]." Defendant shot twice. Then he turned away from them and shot once more and drove away. Defendant testified that he "never, ever, ever, ever, never once . . . aimed at anybody; [he] never once deliberately tried to shoot [Yeager]." He testified he "was trying to back them up off of [him]" and that he "had zero intentions of killing anybody."

Defendant testified that he drove to a bar called Buddy's Place after he left the victim's house. He later parked his car at a motorcycle club called The Dragon's and left with some friends to get beer. Defendant did not change clothes or do anything else to hide the fact that he had fired shots at the victim's home because he "didn't think anybody got shot." When he was later stopped by the police, he hid his gun under the passenger's seat.

-4-

He did not believe detectives when they told him that the victim had died. He believed he was being pulled over because he had been drinking and he was "in a drug area[.]"

*Analysis*

Defendant contends that the evidence was insufficient to support his conviction for second degree murder. Specifically, Defendant argues that the evidence failed to show that Defendant "was 'reasonably certain' that discharging his weapon would result in the victim's death." Defendant also asserts that the evidence "was overwhelming" that Defendant's conduct was justified by self-defense.

When an accused challenges the sufficiency of the convicting evidence, the standard of review is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004); *see also* Tenn. R. App. P. 13(e). "[T]he State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). The trier of fact is to resolve questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence, and an appellate court must not reweigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). An appellate court may not "substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact." *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A jury verdict approved by the trial court accredits the State's witnesses and resolves all conflicts in the evidence in favor of the State. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Moreover, the State does not have a duty to exclude every other reasonable hypothesis except that of guilt. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210. A person acts knowingly with respect to the result of his conduct when he is aware that such conduct is reasonably certain to cause the death of the victim. *Id*. § 39-11-106(a)(20).

The evidence, taken in a light most favorable to the State, shows that the victim called Luella Tower and asked her to pick him up and drive him to her house because he feared that someone was coming to his house to assault him. Defendant drove by the victim's house and turned around. The victim and Mr. Rostorfer approached Defendant's car and said that they did not want any trouble. Defendant responded, "I've got something for you," and fired three shots. One of the shots struck the victim in the back as he ran away from Defendant's car. The gun recovered from Defendant matched a spent shell found at the scene, and Defendant had gunshot residue on his clothes. The victim identified Defendant as the person who shot him. We conclude that this evidence is sufficient to establish that Defendant knowingly killed the victim.

Defendant argues that the evidence did not establish that Defendant was reasonably certain that firing his gun in the victim's direction would result in the victim's death. Defendant points to forensic testimony that suggested Defendant may have fired one of the shots with his gun turned sideways, causing one of the spent shells to eject at a different angle than the others. We do not agree that the evidence supports this conclusion. Agent Arney gave no opinion as to whether the angle at which Defendant held the gun demonstrated his intent, or lack thereof, to hit the victim. Although Defendant testified that he did not aim his gun at the victim, the jury clearly discredited his testimony. It was certainly reasonable for the jury to conclude that Defendant was aware his conduct was reasonably certain to cause the victim's death. *See State v. Ely*, 48 S.W.3d 710, 723-24 (Tenn. 2001) (affirming the defendant's conviction for second degree murder and stating, "[t]he evidence shows that the defendant aimed and fired a handgun in the general direction of a van containing three people. Such conduct clearly falls within the definition of knowing conduct because [the defendant] had to be aware that he was reasonably certain to strike and kill one of those people.").

Defendant also asserts that the State failed to prove that Defendant did not act in self-defense. Tennessee's self-defense statute, as codified at the time of the offense in this case, provided as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (2006 Repl.).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within a jury's prerogative to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

Defendant asserts that "[m]ultiple witnesses" offered testimony that supports his assertion that the victim and Rostorfer intended to shoot him or drag him from his vehicle and beat him. However, the jury rejected this testimony. Defendant points to the testimony of Rostorfer and Luella Tower that Rostorfer and the victim gave Ms. Tower their keys and wallets before approaching Defendant's car, indicating that they intended to fight Defendant. While there was evidence at trial that the victim anticipated a fight with Defendant, we conclude that the State sufficiently proved that Defendant did not act in self-defense when he fired three shots out of his car window at Rostorfer and the victim, striking the unarmed victim in the back, and then drove away. Although Defendant testified that he was afraid of Yeager and Rostorfer, he drove to Yeager's house and fired his gun from a moving car without knowing whether the victim was armed or unarmed. The evidence supports the jury's rejection of Defendant's self-defense claim.

Next, Defendant asserts that he was "unfairly prejudiced by the trial court's *refusal* to allow" Defendant to cover his facial tattoos with makeup during trial. (Emphasis added). Defendant also asserts that his tattoos "had no relevant purpose at trial" because he did not dispute his identity as the shooter. The State responds that Defendant has waived this issue by failing to raise it at trial. We have reviewed the record and find no request by Defendant to the trial court to allow him to cover his facial tattoos. Defendant first raised the issue in his motion for new trial.

We conclude that waiver of this issue is appropriate based on Defendant's failure to make a contemporaneous objection. Appellate relief is typically not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a). This failure prevented the court from correcting the harmful effect of any alleged error. Accordingly, this issue is waived.

## CONCLUSION

Having reviewed the record before us, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE